

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

**ENTERED**
**04/17/2008**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| EBCO LAND DEVELOPMENT, LTD. | § | Case No. 04-30519 |
| | § | Chapter 11 |
| and | § | |
| | § | |
| JOHN BENNETT EBNER, KAY E. EBNER | § | Case No. 04-30522 |
| | § | |
| | § | Jointly Administered Under |
| Debtors | § | Case No. 04-30519 |
| | § | |
| WOODFOREST PARTNERS. L.P. and WOODFOREST DEVELOPMENT, INC. | § | Adv. No. 07-3501 |
| | § | |
| Plaintiffs | § | |
| | § | |
| vs. | § | |
| | § | |
| LDC 11c f/k/a LDC, INC. | § | |
| | § | |
| Defendant | § | |

**MEMORANDUM OPINION ON (1) DEFENDANT'S MOTION TO DISMISS PURSUANT TO F.R.C.P. 12(b)(1) AND 12(b)(6); and (2) PLAINTIFFS' MOTION TO DISMISS COUNTERCLAIM PURSUANT TO F.R.C.P. 12(b)(6)**
[Docket Nos. 7 and 8]

I.   Introduction

On December 10, 2007, Woodforest Partners, L.P. and Woodforest Development, Inc. (collectively, Woodforest) initiated this adversary proceeding by filing its complaint for declaratory judgment (the Complaint) against LDC 11c f/k/a LDC, Inc. (LDC ). [Docket No. 1.] On January 18, 2008, LDC filed a single pleading that included its Motion to Dismiss, Original Answer, and Counterclaim Subject to the Motion to Dismiss. [Docket No. 7.] LDC requested dismissal under

both Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). [*Id.* at ¶¶ 17-18.] On February 6, 2008, Woodforest filed its own Motion to Dismiss the Counterclaim filed by LDC. [Docket No. 8.] On the same date, Woodforest filed two separate Responses to the LDC Motion to Dismiss; one Response addresses LDC's Motion to Dismiss under Rule 12(b)(6) [Docket No. 9], and the other Response addresses LDC's Motion to Dismiss under Rule 12(b)(1). [Docket No. 10.] On March 5, 2008, the Court held a hearing on the competing Motions to Dismiss. On the record at this hearing, the Court concluded that it had subject matter jurisdiction over this post-confirmation adversary proceeding.[1] To the extent that any of the findings of fact and conclusions of law set forth herein contradict those made orally on the record, the written findings of fact and conclusions of law govern. In addition to denying LDC's Motion to Dismiss under Rule 12(b)(1), this Memorandum Opinion also disposes of LDC's Motion to Dismiss under Rule 12(b)(6) and Woodforest's Motion to Dismiss the Counterclaim of LDC.[2]

## II. Background of the Complaint and the declaratory relief sought therein

The Debtors filed a Chapter 11 petition on January 5, 2004. [Main Case, Docket No. 1.] A protracted discussion of the underlying Chapter 11 case is not necessary or relevant to this Memorandum Opinion. The Court addresses only those events in the main case that gave rise to this adversary proceeding.

---

[1] The Court granted the parties seven days to file briefing on any issues raised at the hearing. Upon request from LDC, the Court extended this deadline until March 18, 2008. However, neither Woodforest nor LDC filed any post-hearing brief.

[2] On April 10, 2008, the Court signed an agreed order consolidating Adversary Proceeding Number 08-3072 with the instant adversary proceeding. This Memorandum Opinion relates exclusively to Adversary Proceeding Number 07-3501 and has no bearing on any claims brought in Adversary Proceeding Number 08-3072.

On November 3, 2004, this Court signed an agreed order approving the sale of three parcels of real property free and clear of all liens, claims, and encumbrances (the Agreed Order to Sell).[3] [Main case, Docket No. 197.] RC Mac Partners, L.P. (RC Mac) was the purchaser of these three parcels (the Properties), which became the subject of this adversary proceeding.[4] Four parties filed objections to the sale of the Properties free and clear of all liens, but LDC, despite having notice of the Motion to Sell Assets Free and Clear of All Liens, Claims and Encumbrances [Docket No. 198], was not one of these parties. After this Motion was filed, the Court signed the Agreed Order to Sell. This Order states that the Properties "shall be sold free and clear of all liens, claims and encumbrances except for exceptions expressly permitted by the Sale Agreement [interlineation - specifically excluded by paragraph ix below]. All removed and non paid liens, claims and encumbrances shall attach to the proceeds of sale." [*Id.* at p. 2.] The Agreed Order to Sell goes on to state that the only liens, claims, and encumbrances to survive the sale are property taxes, purchase money liens, and "other exceptions expressly permitted by the Sale Agreement." [*Id.* at p.7.]

On March 23, 2005, the Court signed an order (the Confirmation Order) confirming the Third Amended Chapter 11 Plan of Liquidation (the Plan).[5] [Main Case, Docket No. 286.] The

---

[3] This agreed order was supplemented by a Supplemental Agreed Order entered on March 11, 2005. [Main Case, Docket No. 257.] The parties were unable to close on the sale within the 90-day period set forth in the original Agreed Order to Sell. This Supplemental Agreed Order to Sell extended the deadline for closing and made minor changes to the purchase sale agreement.

[4] The actual party referenced in the Confirmation Order is Ratcliff Holdings, L.L.C., but prior to the closing of the sale, Ratcliff Holdings L.L.C. transferred its rights in the Sale Agreement to RC Mac Partners, L.P. [Docket No. 1, ¶ 17.]

[5] The terms of the Plan required all of the non-exempt property of the Debtors' estate to be transferred to a liquidating trust. [Main Case, Docket No. 247, Art. 7.] When this Court refers to non-exempt property of the Debtors, it is referring to the non-exempt property of the *individual* debtors, John Bennett Ebner and Kay E. Ebner. In a previous adversary proceeding [Case No. 04-3363], the Ebners agreed to transfer all of their non-exempt real property to the jointly administered bankruptcy estate. Thus, property owned by the Ebners was transferred to the estate and subsequently transferred from the estate to the liquidating trust pursuant to the confirmed Plan. It must remembered that

Confirmation Order states: "Upon the Effective Date of the Plan as defined in the Plan, all persons holding any Lien, Claims, interest or Encumbrance against or in the Debtors or the Property of any kind or nature whatsoever, shall be, and hereby are, forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing such Lien, Claims, interest or Encumbrance." [Main Case, Docket No. 286, ¶ 13.]

LDC asserts that it entered into pre-petition contracts with EBCO Land and Development, Ltd. (EBCO) and Triple L Sales and Development, Ltd. (Triple L Sales) that granted LDC an easement on the Properties in order to install natural gas pipelines. LDC contends that this easement continues to be in full force and effect today and nothing that has occurred in these jointly administered Chapter 11 cases has terminated this easement.

Woodforest strongly disagrees. After the Debtor sold the Properties to RC Mac pursuant to the Agreed Order to Sell, RC Mac subsequently sold the Properties to Woodforest. Woodforest contends that by virtue of the Agreed Order to Sell—which was incorporated into the Plan and Confirmation Order—Woodforest took the Properties free and clear of all liens and encumbrances, including the LDC contracts and LDC's easement.

Woodforest also contends that LDC's reliance on the two contracts is wholly misplaced due the Confirmation Order that this Court signed. The Confirmation Order states that the "[e]ntry of this Confirmation Order shall constitute the rejection of all pre-petition executory contracts or unexpired leases." [Main Case, Docket No. 286, ¶ 33.] Woodforest argues that the express language

---

the Chapter 11 case of the Ebners is jointly administered with the Chapter 11 case of EBCO Land Development Ltd., which, because it is an entity, has no exempt property and therefore never needed to transfer non-exempt property to the jointly administered estate.

in the Confirmation Order resulted in a rejection of LDC's pre-petition contracts with the Debtors and an entity controlled by the Debtors.[6]

In sum, Woodforest seeks a judgment declaring that (1) the Properties are free and clear of all liens, claims, interest or encumbrances, including those, if any, of LDC; and (2) the contracts between LDC and EBCO and LDC and Triple L Sales were executory and rejected by the Confirmation Order. Woodforest requests this relief because it contends that the continuing claims being asserted by LDC are an impediment to developing the Properties into a subdivision of single-family homes.

### III. LDC's Motion to Dismiss pursuant to Rule 12(b)(1)

LDC's Motion to Dismiss contains only one sentence: "LDC respectfully moves to dismiss this action under Fed. R. Civ. P. 12(b)(1) because this Court lacks jurisdiction over the subject matter of this action." [Docket No. 7, ¶ 17.] Since there is a confirmed plan in the main bankruptcy case, the Court will assume that LDC's argument is based upon the Fifth Circuit rule that a bankruptcy court's post-confirmation subject matter jurisdiction is narrower than its pre-confirmation jurisdiction.

The leading Fifth Circuit case on post-confirmation bankruptcy jurisdiction is *Bank of Louisiana v. Craig's Stores of Tex., Inc.* (*In re Craig's Stores of Tex., Inc.*), 266 F.3d 388 (5th Cir.

---

[6] The Court would also note that, on February 28, 2005, it approved the Third Amended Disclosure Statement, which expressly sets forth, under a section entitled "Treatment of Executory Contracts and Unexpired Leases," the following: "To the extent that such executory contract or unexpired lease exists, the Plan constitutes and incorporates a motion by the Committee to reject, as of the Effective Date, all executory contracts and unexpired leases to which the Debtors are a party." [Main Case, Docket No. 229, Sec. 4(G).] This language tracks with language in the Confirmation Order and clearly put all creditors and parties-in-interest on notice well in advance of the confirmation hearing that the Debtors intended to reject all executory contracts.

5

2001).[7] In *Craig's Stores*, the reorganized debtor sued a bank asserting state law claims 18 months after a plan was confirmed. In restricting the bankruptcy court's post-confirmation jurisdiction, the Fifth Circuit stated:

> The more persuasive theory of post-confirmation jurisdiction, however, attaches critical significance to the debtor's emergence from bankruptcy protection. As the Seventh Circuit put it,
>
>> Once the bankruptcy court confirms a plan of reorganization, the debtor may go about its business without further supervision or approval. The firm also is without the protection of the bankruptcy court. It may not come running to the bankruptcy judge every time something unpleasant happens.
>
> [citations omitted] *After a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan.* [citations omitted] No longer is expansive bankruptcy court jurisdiction required to facilitate "administration" of the debtor's estate, for there is no estate left to reorganize. This theory has antecedents in our court's jurisprudence, which has observed that the reorganization provisions of the former Bankruptcy Act "envisage[ ] that out of the proceedings will come a newly reorganized company capable of sailing forth in the cold, cruel business world with no longer the protective wraps of the federal Bankruptcy Court." [citations omitted] Because it comports more closely with the effect of a successful reorganization under the Bankruptcy Code than the expansive jurisdiction cases, we adopt this more exacting theory of post-confirmation bankruptcy jurisdiction.

*Id.* at 390-391 (emphasis added). *see also In re U.S. Brass Corp. v. Travelers Ins. Group, Inc. (In re U.S. Brass Corp.)*, 301 F.3d 296, 305 (5th Cir. 2002) ("Bankruptcy law will ultimately determine this dispute, and the outcome could affect the parties' post-confirmation rights and responsibilities. Furthermore, this proceeding will certainly impact compliance with or completion of the

---

[7] At the hearing, the Court made comments indicating that it believed that the Plan preserved the estate and that the *Craig's Stores* analysis might therefore not apply. After further review of the Plan, however, the Court is unable to find any language preserving the estate following confirmation. Therefore, the Court will not pursue the line of reasoning it was articulated on the record regarding jurisdiction arising out of a preserved estate. Instead, this Memorandum Opinion focuses exclusively on the *Craig's Stores* analysis of post-confirmation jurisdiction where an estate no longer exists.

reorganization plan. Consequently, the Appellants' motion pertains to the plan's implementation or execution and therefore satisfies the *Craig's Stores* test for post-confirmation jurisdiction.").

Thus, a bankruptcy court's post-confirmation jurisdiction over an adversary proceeding hinges upon whether that suit concerns "matters pertaining to the implementation or execution of the confirmed plan." *Id.*

Although neither *Craig's Stores* nor *U.S. Brass* describe any specific factors for a bankruptcy court to consider in determining its post-confirmation jurisdiction, this Court has previously distilled the holdings of these two cases into a six-factor analysis. *Gilbane Bldg. Co. v. Air Sys., Inc. (In re Encompass Servs. Corp.)*, 337 B.R. 864, 874-77 (Bankr. S.D. Tex. 2006), *aff'd*, 2006 U.S. Dist. LEXIS 28406 (S.D. Tex. May 3, 2006) (Rosenthal, J.). The Court now applies this six-factor analysis to the adversary proceeding at bar.

A. **Does state law or bankruptcy law govern the suit?**

The Court believes that the importance of this factor overwhelms any of the remaining factors. As in *U.S. Brass*, bankruptcy law will determine the outcome of this dispute. *U.S. Brass*, 301 F.3d at 305. The questions of law underlying this adversary proceeding are (1) whether this Court had authority under 11 U.S.C. § 363 to order the that Properties be sold free and clear of LDC's easement; and (2) whether the Confirmation Order rejected LDC's contracts pursuant to 11 U.S.C. § 365. The process for answering both of these questions requires interpretation of certain sections of the Bankruptcy Code and language contained in this Court's prior orders. To the extent that state law issues exist, they are *de minimis*. For example, LDC raised the point that, as a natural gas supplier, it is heavily regulated by the State of Texas. However, LDC has been unable to show any nexus between the issues in this adversary proceeding and a specific state regulation.

7

This suit inverts the traditional notion of comity where a federal court is being deferential to a state court. *See Gober v. Terra+ Corp. (In re Gober)*, 100 F.3d 1195, 1206 (5th Cir. 1996) (citing *Wood v. Wood (In re Wood)*, 825 F.2d 90, 93 (5th Cir. 1987)) (discussing comity in terms of "respect for State law"). Although jurisdiction cannot be based on 11 U.S.C. § 105(a), that section does provide this Court with the power to take any action to enforce its own orders. This Court has a strong interest in adjudicating this adversary proceeding because it will require interpretation and enforcement of its prior orders—namely, the Order approving the Third Amended Disclosure Statement, the Agreed Order to Sell, and the Confirmation Order. Conversely, a state court would have little interest in this adversary proceeding because it is entirely premised upon federal bankruptcy law.

Finally, it is important to recall that the ultimate question posed by the Fifth Circuit in *Craig's Stores* is whether the proceeding pertains to the implementation or execution of the confirmed plan. *Craig's Stores*, 266 F.3d at 390. *Craig's Stores* involved the post-confirmation breach of a pre-petition contract that was expressly assumed in the plan. *Craig's Stores*, 266 F.3d at 391. Since the contract in *Craig's Stores* was assumed and not rejected, the plan did not alter any rights or obligations under the contract. Thus, when the contract was breached, the suit resulting from that breach had no connection to the implementation or execution of the plan. The suit would have been the same had no bankruptcy ever been filed. However, in the case at bar, the Debtors expressly rejected the LDC contracts in the Confirmation Order. Thus, unlike *Craig's Stores*, the issues in this adversary proceeding are not state law contract issues, but are wholly bankruptcy issues—were the contracts rejected pursuant to § 365 and did the Agreed Order to Sell terminate

LDC's easement under § 363? Accordingly, this first factor strongly favors post-confirmation jurisdiction.

### B. When did the claim at issue arise?

Several cases analyzing post-confirmation jurisdiction have found that the court retains jurisdiction if the claim arose pre-petition, particularly when the claim was incorporated into the plan of reorganization. *U.S. Brass*, 301 F.3d at 299-300; *Coho Oil & Gas, Inc. v. Finley Res., Inc. (In re Coho Energy, Inc.)*, 309 B.R. 217, 221 (Bankr. N.D. Tex. 2004). Conversely, one of the reasons the Fifth Circuit found that the bankruptcy court lacked jurisdiction in *Craig's Stores* was that the claim arose out of a post-confirmation breach. *Craig's Stores*, 266 F.3d at 391.

The Complaint here seeks declaratory judgment on two issues: (1) whether the Properties are owned by Woodforest free and clear of any interest of LDC as a result of the Agreed Order to Sell and the Confirmation Order; and (2) whether the pre-petition contracts between LDC and EBCO and LDC and Triple L Sales were rejected as a result of the Confirmation Order.

Neither of the disputed issues at bar arose post-confirmation. The first issue—whether LDC's easement was terminated by the Agreed Order to Sell—unquestionably arose pre-confirmation. The Agreed Order to Sell was entered into and approved four and one-half months prior to confirmation.[8] The fact that Woodforest purchased the Properties after confirmation of the

---

[8] It is worth noting that counsel for LDC admitted on the record at the March 5, 2008 hearing that LDC was a member of the Committee of Unsecured Creditors whose counsel signed both the Motion to Sell Assets Free and Clear of All Liens, Claims and Encumbrances and the Agreed Order to Sell. In addition to being represented by counsel for the Committee, LDC was also independently represented by Michael Swaim, who filed a Notice of Appearance in the main case on February 24, 2004. [Main Case, Docket No. 17.] Michael Swaim is also counsel for LDC in this adversary proceeding. Moreover, the Certificate of Service of for the Motion to Sell Free and Clear indicates that Michael Swaim received notice of this motion. [Main Case, Docket No. 198.] Thus, it is impossible for LDC to argue that it did not actively participate in the Debtors' Chapter 11 case or that it did not have notice of the Motion to Sell Assets Free and Clear of All Liens, Claims and Encumbrances, the Agreed Order to Sell, the Third Amended Disclosure Statement, the hearing on the Third Amended Disclosure Statement, the Plan, the confirmation hearing, and the Confirmation Order.

Plan in no way alters the date on which the claims in this adversary proceeding arose. If LDC's easement was extinguished by the Agreed Order to Sell, as Woodforest contends, the claims arose well before the Plan was confirmed.

The second issue—whether the two LDC contracts were rejected—occurred, at the earliest, one month prior to the confirmation hearing when this Court approved the Third Amended Disclosure Statement, which expressly set forth that all executory contracts would be rejected upon confirmation of the Plan.[9] At the latest, the rejection of executory contracts issue arose on the date of the confirmation hearing, when this Court signed the Confirmation Order, which expressly set forth that the "[e]ntry of this Confirmation Order shall constitute the rejection of all pre-petition executory contracts or unexpired leases." [Main Case, Docket No. 286, ¶ 33.] Under either approach, the Court concludes that the rejection of executory contracts issue could *not* have arisen post-confirmation.

Unlike *Craig's Stores*, neither of the issues in this adversary proceeding could possibly have arisen post-confirmation. LDC cannot sit idly by only to spring up three years later and argue that these claims arose post-confirmation. Accordingly, this factor favors post-confirmation jurisdiction.

### C. Are there provisions in the confirmed plan expressly retaining jurisdiction?

"While a plan may not confer or expand subject matter jurisdiction, some courts find a retention of jurisdiction in the plan to be a prerequisite to post-confirmation jurisdiction. In other words, a plan which fails to retain subject matter jurisdiction may leave it lacking, but a plan cannot

---

[9] In fact, the original disclosure statement and all amended disclosure statements contained the exact same language rejecting all executory contracts that appeared in the Third Amended Disclosure Statement. [Docket Nos. 165, 214, and 228.] Therefore, LDC was actually put on notice of the Debtors' intent to reject all executory contracts as early as October 26, 2004, the date when the first disclosure statement was filed. Thus, LDC had notice five and one-half months prior to the confirmation hearing.

10

create jurisdiction where it does not otherwise exist." *In re Coho Energy, Inc.*, 309 B.R. at 220 n.4; *cf. In re U.S. Brass, Corp.*, 301 F.3d at 303 (noting that the plan contained a broad retention of jurisdiction provision).

Article 9 of the Plan contains a paragraph titled "Retention of Jurisdiction" which reads:

> After the Effective Date of the Plan, the Bankruptcy Court will continue to have jurisdiction of certain matters arising under, arising out of or relating to this Chapter 11 Case. Such jurisdiction will be exercised to (a) insure that the purpose and intent of the Plan are carried out . . . (c) hear and determine all controversies, suits and disputes that may arise in connection with the interpretation, execution or enforcement of the Plan . . . (e) enforce or interpret by injunction or Otherwise, the terms and conditions of the Plan . . . (h) consider and act on such other matters consistent with the Plan as may be provided in the Confirmation Order.[10]

This adversary proceeding is a suit arising in connection with the interpretation, implementation, enforcement, and integrity of the Plan. The Plan contemplates the continuing post-confirmation jurisdiction of the Court to adjudicate this dispute. Accordingly, because there is language in the Plan referencing post-confirmation jurisdiction for disputes such as the one in this adversary proceeding, this factor is not a bar to post-confirmation jurisdiction.

### D.  Has substantial consummation occurred?

An action impacting a confirmed, but not substantially consummated, plan would have an impact on the debtor-creditor relationship, a factor which favors continuing jurisdiction. *See Craig's Stores*, 266 F.3d at 391. Substantial consummation in defined by 11 U.S.C. § 1101(2) as "(A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the

---

[10] The Confirmation Order contains nearly identical language. [Main Case, Docket No. 286, ¶ 39.]

11

management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan."

There is no question that substantial consummation of the Plan has occurred. The Plan was confirmed more than three years ago, all of the estate property was transferred to the liquidating trust, and the liquidating trust has made distributions to creditors. In fact, in his motion to close the main case, the liquidating trustee admitted that the Plan has been substantially consummated.[11] [Case No. 04-30522, Docket No. 41, ¶ 5.] Accordingly, this factor weighs against post-confirmation jurisdiction.

### E.   Is the reorganized debtor a party, or are all parties non-debtors?

The Debtors have no interest in this adversary proceeding. The Properties were sold by the Debtors to RC Mac pursuant to the Agreed Order to Sell. RC Mac subsequently sold the Properties to Woodforest. Thus, Woodforest and LDC are both non-debtor parties. Accordingly, this factor weighs against post-confirmation jurisdiction.

### F.   Are there any indices of forum shopping?

There are no indicia of forum shopping present, or even alleged by the parties, and therefore this factor favors post-confirmation jurisdiction.

In sum, four of the six *Craig's Stores* factors favor a finding that this Court has post-confirmation jurisdiction over this adversary proceeding. That more factors favor jurisdiction does not automatically mean that this Court should hold that it has jurisdiction. Indeed, the fact that the Debtors are not parties to this proceeding and that the Plan has been substantially consummated are

---

[11] The liquidating trustee withdrew his motion to close case after receiving notice of potential additional claims. [Case No. 04-30522, Docket No. 44.] Thus, the jointly administered Chapter 11 case is still open.

12

not insignificant considerations. However, the Court is ultimately persuaded by the fact that this adversary proceeding is fundamentally about the interpretation and implementation of three extremely important orders issued by this Court that are unique to the bankruptcy process: (1) the Agreed Order to Sell pursuant to 11 U.S.C. § 363; (2) the Order approving the Third Amended Disclosure Statement pursuant to Bankruptcy Rule 3017; and (3) the Confirmation Order pursuant to Bankruptcy Rule 3020(c). For these reasons, the Court concludes that it has subject matter jurisdiction over this adversary proceeding and that LDC's Motion to Dismiss pursuant to Rule 12(b)(1) should be denied.

### IV. LDC's Motion to Dismiss pursuant to Rule 12(b)(6)

Like its Motion to Dismiss under Rule 12(b)(1), LDC's Motion to Dismiss under Rule 12(b)(6) contains only one sentence: "LDC respectfully moves to dismiss this action under Fed. R. Civ. P. 12(b)(6) because the complaint fails to state a claim for which relief can be granted." [Docket No. 7, ¶ 17.]

In ruling on a Rule 12(b)(6) motion, the Court must determine, in the light most favorable to the non-movant, whether the complaint states any valid claim for relief. *Cinel v. Connick*, 15 F.3d 1338 (5th Cir. 1994). "A motion to dismiss under Rule 12(b)(6) is viewed with disfavor and is rarely granted." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000). When ruling on a Rule 12(b)(6) motion, the Court must "construe the complaint in favor of the plaintiff and assume the truth of all pleaded facts." *Oliver v. Scott*, 276 F.3d 736, 740 (5th Cir. 2002) (citing *Brown v. Nationsbank Corp.*, 188 F.3d 579, 586 (5th Cir. 1999)). The complaint need only contain facts sufficient "for an inference to be drawn that the elements of [the claim] exist." *Walker v. South Cent. Bell. Tel. Co.*, 904 F.2d 275, 277 (5th Cir. 1990). However, the complaint must allege "more

than labels and conclusions" and "a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007).

The Court separately addresses the two declaratory judgments sought by Woodforest. The first question is whether the Agreed Order to Sell, the Confirmation Order, and the Plan terminated LDC's easement on the Properties. LDC makes several unpersuasive arguments in support of dismissing the Complaint as to this first question. LDC asserts that the "clear intent of the order [i.e. the Agreed Order to Sell] was to remove impediments to the transfer of clear title to the property and nothing more." [Docket No. 7, ¶ 16.] This statement is not only conclusory, but the conclusion it reaches is not supported by the plain language of the Agreed Order to Sell, which states that the Properties "shall be sold free and clear of all liens, claims and encumbrances." The Confirmation Order contains similar language: "all persons holding any Lien, Claims, interest or Encumbrance against or in the Debtors or the Property of any kind or nature whatsoever, shall be, and hereby are, forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing such Lien, Claims, interest or Encumbrance." There is nothing on the face of either order to show a "clear intent" to exclude LDC's easement from operation of 11 U.S.C. § 363. The Complaint satisfactorily alleges that LDC had a pre-petition easement on the Properties and that the Agreed Order to Sell referenced *all* liens, claims, and encumbrances, including LDC's easement.

LDC also contends that the interests it acquired as a result of the contracts "do not constitute an 'encumbrance' upon the properties." [Docket No. 7, ¶ 55.] However, elsewhere in the Motion to Dismiss, LDC admits that the contracts conveyed to it "appurtenant rights of way or easements." [Docket No. 7, ¶ 22.] An encumbrance is defined as "a claim or liability that is attached to property or some other right and that may lessen its value, such as a lien or mortgage; any property right that

14

is not an ownership interest." Black's Law Dictionary 547 (7th Ed. 1999). LDC's easement qualifies as an encumbrance because it is a non-ownership interest in land owned by another. Moreover, the Court would also note that LDC's argument too narrowly focuses on the phrase "encumbrance" when the Agreed Order to Sell and the Confirmation Order purported to estop the enforcement of any lien, claim, interest or encumbrance on the Properties. Even if the easement does constitute an encumbrance, it would be, at a minimum, a claim or interest and, thus, still subject to the language in the Agreed Order to Sell and the Confirmation Order. Accordingly, the Complaint states a claim upon which relief may be granted as to the first question for declaratory judgment.

The second question is whether LDC's contracts with EBCO and Triple L Sales were rejected by the Confirmation Order. LDC argues that neither of the contracts were executory and therefore could not be rejected in the Confirmation Order. The Fifth Circuit applies the Countryman definition of executoriness, which states that a contract is executory on the petition date if it is: "A contract under which the obligation of both the bankrupt and the counterparty to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *Phoenix Exploration v. Yaquinto (In re Murexco Petroleum)*, 15 F.3d 60, 63 n.8 (5th Cir. 1994) (citing Vern Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L. Rev. 439, 460 (1970); *see also Lifemark Hosps., Inc. v. Liljeberg Enters. (In re Liljeberg Enters.)*, 304 F.3d 410, 436 (5th Cir. 2002).

LDC claims that its only ongoing obligations under the contract are owed to the individual home owners and not to Woodforest. LDC admits that it has an ongoing obligation to provide gas to the current customers as well as to provide gas connection to newly constructed homes as they are built on the Properties. On the other side of the contract, LDC admits that it was owed payment from

15

both EBCO and Triple L Sales on the petition date. The EBCO debt was satisfied during the Chapter 11 case, but LDC now attempts to waive the debt it is owed by Triple L Sales in an effort to defeat any potential executoriness. This, LDC may not do.[12]

Woodforest relies on other portions of the contract to establish executoriness. One obligation that it has as the developer is to "acquire payment of the gas main availability fee of $860.00 for each electric home that begins construction of the development. Developer shall pay LDC an amount of $430.00 in each electric home within (10) days after ACC approval." [Docket No. 10, ¶ 11.] Additionally, the contracts provide for LDC's future construction of gas mains and lateral lines in various stages and the installation of taps and meters for newly constructed homes. [*Id.*] This language shows that the parties contemplated some ongoing obligations. The Court concludes that the Complaint sufficiently alleges facts establishing that the two contracts were executory and could have been rejected in the Plan.

LDC makes a separate argument regarding only the Triple L Sales contract, which does not apply to the EBCO contract: Triple L Sales was not a debtor in this or any other Chapter 11 case. LDC therefore asserts that it was impossible for its contract with Triple L Sales to be rejected in the Plan. [Docket No. 7, ¶ 56.] As discussed in footnote number five, the Debtors were involved in a prior adversary proceeding [Adv. No. 04-3363] in which the Official Committee of Unsecured Creditors sought a turnover of non-exempt assets held by non-debtor entities for the benefit of the jointly administered estate. That adversary proceeding resulted in an agreed order which required

---

[12] A party cannot defeat the executoriness of a contract by waiving its right to enforce performance obligations of the other party because the executory determination is made as of the petition date. *In re Kelly*, 2001 Bankr. LEXIS 2182, at *11 n.2 (Bankr. S.D. Fla. Nov. 29, 2001) (citing *In re Smith Corona Corp.*, 210 B.R. 243 (Bankr. D. Del. 1997)).

the Debtors to convey certain assets held by entities controlled by the Debtors to the jointly administered estate. Included in these transferred assets were "all of the rights, title and interest in and to all non-exempt personal property, including tangible and intangible, wheresoever located, belonging to the Entities," and "any and all assets not set forth above of any related third-party entities in which the Debtors may be entitled to an interest, including but not limited to the Entities." [Adv. No. 04-3363, Doc. No. 4.] Woodforest asserts that this quoted language includes the Triple L Sales contract with LDC because Triple L Sales is included in the defined term "Entities." [Adv. No. 04-3363, Doc. No. 4, ¶ B(1).] Pursuant to the agreed order in the prior adversary proceeding, Triple L Sales' rights in the contract with LDC were transferred to the Debtors' estate, and the estate had the right to assume or reject that contract just as it had the same rights in the LDC contract with EBCO. Thus, the fact that Triple L Sales was not a debtor in this Chapter 11 case does not bar Woodforest's request for declaratory judgment that the contract between Triple L Sales and LDC was executory and rejected by the Confirmation Order.

For all of the reasons stated above, the Court concludes that LDC's Motion to Dismiss pursuant to Rule 12(b)(6) should be denied in its entirety.

V.   **Woodforest's Motion to Dismiss the counterclaim of LDC pursuant to Rule 12(b)(6)**

The entirety of LDC's counterclaims reads: "If, in fact, the contracts at issue were, or could be, rejected by this court, then such rejection has proximately caused LDC actual damages due to such rejection of at least $700,000 and as much as $3.8 million." [Docket No. 7, ¶ 58.][13] The "contracts" referred to in the counterclaim are (1) LDC's contract with EBCO to distribute natural

---

[13]LDC is incorrect when it states that the contracts may have been rejected by this Court. A debtor is the party who rejects a contract. The Court interprets the counterclaim to mean that the contracts were rejected by the Debtors as a result of this Court signing the Confirmation Order.

gas services to residences located on the certain tracts in Montgomery County, Texas; and (2) LDC's contract with Triple L Sales to distribute natural gas services to residences located in the proposed Woodforest development. [Docket No. 7, ¶¶ 6 and 7.] Both of these contracts granted LDC an utility easement to lay natural gas pipes on the Properties and LDC was granted the exclusive right to provide natural gas services to residences within the areas covered by the contracts. [Docket No. 7, ¶ 8.]

LDC's counterclaim is for damages arising out of the rejection of the two contracts. Any claims that LDC has based upon a rejection of the contracts should have been filed against the Debtors. However, LDC's counterclaim is not brought against the Debtors, but rather against Woodforest. LDC has never had a contractual relationship with Woodforest. Indeed, it must be remembered that Woodforest purchased the Properties from RC Mac, who had purchased the Properties from the Debtors. Therefore, LDC has failed to state a claim because it has not shown how it was in privity with Woodforest. Accordingly, Woodforest's Motion to Dismiss the counterclaim of LDC should be granted.

## VI.   Conclusion

The Court concludes that it does have post-confirmation subject matter jurisdiction because the issues raised in this adversary proceeding relate to the interpretation, implementation, execution, and integrity of the Plan, the Confirmation Order, the Third Amended Disclosure Statement, and the Agreed Order to Sell. Therefore, LDC's Motion to Dismiss under Rule 12(b)(1) must be denied. LDC's Motion to Dismiss under Rule 12(b)(6) must also be denied because Woodforest has pleaded sufficient facts related to the rejection of the contracts and the Agreed Order to Sell in order to state a claim upon which the requested declaratory relief could be granted. Finally, the Court concludes

that LDC's Counterclaim fails to state a claim against Woodforest because any claim arising from the rejection of the LDC contracts would be against the Debtors and not Woodforest. Thus, Woodforest's Motion to Dismiss the Counterclaim of LDC under Rule 12(b)(6) should be granted. Two corresponding orders will be entered on the docket simultaneously with the entry of this Memorandum Opinion.

Signed on this 17th day of April, 2008.

Jeff Bohm
U.S. Bankruptcy Judge